The next case we're going to hear this morning is Cartagena v. Lovell. And Ms. Whittekind, is that pronounced wrong or right? Whittekind, Your Honor. Whittekind. Thank you. Whittekind. Kind. Kind. Okay. Good morning. May it please the Court. Again, Jennifer Whittekind for Plaintiff Appellant Angel Cartagena. Mr. Cartagena has a serious mental illness, a condition that makes him particularly vulnerable to the serious harms caused by solitary confinement conditions. Nevertheless, officials placed him, isolated him, for more than 18 months in a solitary confinement unit designed to segregate people with mental health disabilities from the general prison community. Can I ask you just, I know you're brief and so forth, you called it solitary confinement. Virginia takes issue with that characterization and said it is a unit subject to a program called SCORE where the inmate can define the level of his incarceration based by compliance or working with the program and that he's basically refused to do that. But they do not refer to it as, they say it's explicitly, I think, not solitary confinement. And I don't know if you have any more information about that, but it obviously is a special unit. But what do you know about that? Well, Your Honor, the name of a unit is not what defines the conditions in those units. Oh, I understand that. And we accept what he's alleging because actually his complaint is fairly articulate. It's a 16-page complaint with tons of exhibits attached and so forth. But solitary confinement is often thought of as a place where prisoners are placed in punishment for certain grievances. And here he was put in a special unit, they call it SDTP unit, which is designed to handle somebody who can't be in the population but who can be helped if he'll cooperate. And of course he doesn't have to and he didn't in this case, which is an unfortunate circumstance. But, well, go ahead. I didn't mean to, there's no real debate on that. We take his allegations. Yes, and we use the term solitary confinement to describe the constellation of conditions that he alleges. You know, as the expert, Amiki, explained, solitary confinement is defined by conditions that severely restrict social, environmental, and occupational stimulation. And those are the conditions that Mr. Cartagena alleged here. Arguably here, he had to be confined in that way because he could not live in any other population group within the prison system because of the way he acted out and his mental illnesses and that sort of thing. So this seems to be very different from some of the other cases dealing with solitary confinement on the basis of someone's sentence or even by reason of their prison record and behavior because it introduces the extra component of mental illness. And there was at least some degree of a treatment regimen involved here. Well, a couple of points in response to that, Your Honor. First, there is nothing in the complaint or in the attachments that speaks to what behavior, if any, led to Mr. Cartagena's isolation in the SDTP. We do know from the attachments... ...a hearing or an opportunity to be heard before he was put in there. That's correct. He doesn't know why he was put in. That's correct. Based on the complaint. Right. That's correct. We may find out in discovery why, but we're looking at the complaint at this stage. Correct. Yes. And nothing in the complaint speaks to any behavior. All he was told is he was placed there because he has a serious mental illness. Well, no, that's not fair because a complaint refers numerous times to the notion that he could not be in the general population. I don't know what the exact language was, but that he was not...he was too aggressive for the general population and they had to protect the population. And he included those allocations in his complaint. So in the complaint or in one of the grievance responses, there was the phrase, an inability to function in the general population. Yes, yes, yes. That's at Joint Dependents, page 46. But that could mean anything. You're talking about the grievance response. That was after he was put in whatever this unit's called, correct? Yes, that was provided to him nine to ten months after he was placed in the unit. And, again, it sort of broadly referred to an inability to function.  It does not imply any type of other behavior. And the policy... Inability to function in a prison population. There was a risk of the prison population. He could not socialize. Well, again, I think that's drawing an unfair inference at this point. That's drawing an inference against him. And at this motion to dismiss stage, all inferences must be drawn in his favor. And even if there was a legitimate penological interest at play here, under the law, the effect of that interest is unsettled under the Eighth Amendment. We need to look at the allegations as he made clear, which is that knowing solitary confinement causes serious harm, particularly to people with serious mental illness. Officials disregarded that risk of harm and placed a man with a long history of serious mental illness into those conditions. They placed him there knowing it could be indefinite, and they only removed him after a serious suicide attempt. How, if at all, should we deal with Apolli's argument that the conditions here were impacted by COVID regulations? Well, as a factual matter, Mr. Cartagena was first isolated in the SDTP in November of 2019, which was several months before any COVID operational changes took place. And he specifically alleged in his complaint that he was denied access to congregate religious services even before the COVID changes. And there is nothing in the complaint or in the attachments that indicates that any of the other highly isolating conditions were the result of COVID operational changes. Now, within the unit, there was a question about whether or not this was a therapeutic unit. Again, there is nothing in the complaint that indicates he had access to any type of supportive services or therapy. In fact, these conditions only made his serious mental illness worse. And so whatever description is put on the unit, that did nothing for Mr. Cartagena. Now, I'd like to turn to the disability claims, if I may. I don't believe there's any dispute that Mr. Cartagena is a man with a disability. And under the ADA, Mr. Cartagena was entitled to receive services in the least restrictive or, said another way, the most integrated setting appropriate for him. And treating professionals are supposed to be given deference in this decision. Mr. Cartagena alleged that in his case, treating professionals... So what's the connection, if you were applying an ADA lens, to somebody who's in a very highly confined prison setting? It just seems like sort of a disconnect. You know, you're not talking about somebody who needs a chair to sit on when they're at work. They're in a prison. They're in a prison for a long time. And they apparently are someone who has great difficulty living in prison. So it seems to me that it's difficult to make an ADA application from all our other ADA jurisprudence to a prison setting. Well, Your Honor, the Supreme Court has held unequivocally that the ADA applies in a prison setting. That was in Yeski. And the ADA's implementing regulations specifically apply the integration mandate to prison settings as well, requiring that people who are incarcerated are still provided services in the most integrated setting possible. And again, when we're talking about the most integrated setting possible in the prison setting, we're talking about a setting that gives the individual the most opportunity to interact with his non-disabled peers. And the non-disabled peers in the prison setting being other incarcerated people without disabilities. But here, instead, officials segregated him in a unit solely for people with mental health disabilities. And he alleges he had no opportunity to interact with his non-disabled peers. And in doing so, officials violated the ADA's integration mandate. Under the ADA, officials also had an affirmative obligation to provide reasonable accommodations to Mr. Cartagena while he was in the SDTP. He alleged that he did not want treatment. He did not want mental health treatment without a court order. And he refused it. I mean, I'm looking right here at his complaint, JA-9. And he basically, the defendant denied the opportunity not to participate in mental health treatment care and safety. The plaintiff states he's being detained. In other words, he's rejecting treatment. And he says that again and again. Of course, that's borne out by the fact when he injured himself in an attempt to commit suicide, he was taken to the hospital and he refused treatment there, too. This is a difficult problem. It's a sad problem. But it's a very difficult problem. Here's somebody who is mentally ill. He apparently is not fit for the prison population and he won't accept treatment in a program that's designed to give him treatment and increase his social participation with each step, that SCORE program. And he says, I reject it all. I need a court order before I can get it. That's a difficult problem. Your Honor, we don't dispute that this may be a difficult situation. But that does not change officials' obligations under the ADA. It does because you're arguing that he was denied an accommodation under the ADA and he's rejected it. But treatment is not the only accommodation available. It's not a one-size-fits-all situation. What accommodation? He's in prison. He's incarcerated. So they want to treat him and they want to help him under their program. This is not a punitive program that they're applying here. This is a program to address his condition, his mental health condition. And he says, I don't want to be treated without a court order. And he repeats that again and again. It's sort of his mental health causes him to do that probably. And I don't know how he's doing today because he is in a mental facility, I guess, today, isn't he? To the best of my knowledge, he is back at the River North Correctional Center where this SDTP is located. But let's take a minute to talk about the program that you're referring to. Mr. Cartagena's allegations are that he was confined to his cell alone for at least 21 hours a day. To be removed from his cell? You're picking and choosing. That's cherry picking. He says, I was put there to treat my mental health, and he says they did it without order. They compelled me to go there because they were treating me. But here's a man who does not want the help. He wants a court to order him to do it as if he's being confined for insanity or something. But he's incarcerated, and he has a serious problem, and he has to be helped. There's no question about it. He's apparently articulate, too. I mean, he writes well and is apparently quite smart. But he refuses any offer to help him to accommodate his condition, and his condition is serious. Well, he actually gave several suggestions for how his condition could be accommodated, including moving to a less restrictive setting, and there are such settings available. He referred specifically to a SAM unit, which appears to be a unit that provides a supportive housing environment for people with serious mental health and medical needs that lead a little bit of additional care, but is not, importantly, is not the isolation of the SDTP. The conditions in the SDTP, the programming that we're talking about, if we look back at his complaint and his allegations, that was mandatory programming that was provided while he was chained to a chair under coercion of escalating sanctions if he did not participate. What successful Eighth Amendment case do you think this one is most like in terms of the harshness of the conditions? Well, Your Honor, I think Porter is directly on point. The conditions here were just as restrictive as those in- Wasn't it in Porter, the gravamen of that, that the solitary confinement was based solely on the sentence, not any other determination. Is that right? That is why those plaintiffs were on death row. That's why they were in those conditions. And the court went on to say in that case that this is not a situation where somebody goes into solitary confinement because of their in-prison behavior. So I guess in answer to Judge Thacker's question, I'd be looking for a case that deals with this in the context of mental health and treatment. Sure. Well, Your Honor, I don't believe this court has had the opportunity to consider this precise context. However, the Third Circuit has considered the placement of people with serious mental illness in solitary confinement conditions and held that that gives rise to an Eighth Amendment claim. And I'm sorry, I will have the name of the case for you when I come back up, but there have been a few cases out of the Third Circuit that have addressed those conditions. And in Thorpe, the court was considering people placed in solitary confinement for purportedly behavioral purposes. They did not have serious mental illness, but the state was saying they had a reason for placing them in these conditions. And there, the court looked at conditions very similar to the conditions Mr. Cartagena alleged here and found that they gave rise to an Eighth Amendment claim. I'm nearly at my time, so with my remaining minute, I will just turn to the due process claim. Again, Mr. Cartagena alleges that he received no notice or opportunity to respond when he was placed in the SDTP. And those allegations demonstrate that he was denied. He was not being punished. He was not being punished. He says in his own complaint, he listed all the mental conditions, and he says they've been actually diagnosed and that they were responding to those. Do you need a court order or a hearing to treat somebody for pneumonia or to a broken leg or here's mental health? Your Honor, he has a liberty interest in this case because of the restrictive nature of the conditions that they were placing him in. What if he was punished for that? I'm sorry? If he's being punished for that, for conduct in the prison, where they do have hearings, you file grievances. He filed grievances here, but he didn't do anything wrong for his confinement here. His confinement here was intended to, number one, protect the prison population and, number two, to treat him for his condition, which was antisocial. Your Honor, I'm at my time, but if I may. Yes, of course. A liberty interest is not attached solely if someone is under disciplinary charges, for example. The liberty interest attaches by virtue of the decision-making process that puts someone there and the conditions of confinement that they're going to be in, that they're going to be harsh and atypical conditions, and that is what he's alleging here and why he was entitled to notice and an opportunity to respond. Okay, thank you. All right, we'll hear from Ms. Gallagher. Good morning, and may it please the Court. I'm Kevin Gallagher, Deputy Solicitor General of the Commonwealth of Virginia, representing appellees. With me today is Mike Dingman, Assistant Solicitor General. The Secure Diversionary Treatment Program, or SDTP, is a program for Virginia inmates who have both a mental illness that is serious and a history of committing assaults and other disruptive behaviors. The program provides treatment for these individuals and allows them to work through a program in order to get back into general population. These individuals would otherwise be a threat to both themselves and others in general population. How does any of that matter when we're looking at the allegations in the complaint right now that we're to take as true at this stage? That's right, Your Honor. The complaint is that issue or this is a motion to dismiss stage. So what we have is the allegations in the complaint, we have the exhibits that are attached to the complaint, and we have the policies that are subject to judicial notice. Mr. Cartagena, both in the district court level and on appeal, has asked for this court to consider those exhibits and to consider those policies that are subject to judicial notice. So we have that whole package of materials. And the policies do provide that he should have been given a hearing and an opportunity to be heard before placement in that unit, correct? You're asking about the due process claim, Your Honor? Mm-hmm. So the due process claim, there are several factors that Mr. Cartagena would need to adequately allege in order for there to be... Okay. My question was, does the policy require that he be given a hearing and an opportunity to be heard before he's placed in this unit? That's correct. The policy does, in fact, say that. Mr. Cartagena alleges that he did not receive a hearing. And so on appeal, that is the allegation that we are dealing with. How do you deal with that then when he makes the allegation that's to be taken as true and you can see that the policy itself says he's supposed to have been given a hearing and an opportunity to be heard, and his complaint says he didn't have that? That's right, Your Honor. So how is that not detrimental to your argument on the due process claim? So the due process claim, this court has made clear, there's two steps to the analysis. So first, in the threshold step, which Mr. Cartagena fails at, is that there needs to be a protected liberty interest in the procedures at issue here. Mr. Cartagena agrees, and this court has held in Smith and other cases, that there is no protected liberty interest from the Constitution in avoiding the conditions of solitary confinement. So the only... And Mr. Cartagena agrees, or he just didn't allege it? I believe, if I recall from the briefing, Mr. Cartagena admits, as this court has held in Smith and other cases, that in fact there is no protected liberty interest in the Constitution. This court has been clear about that. So what Mr. Cartagena would need to point to is a Virginia statute, policy, or procedure. Wait, no protected... What case are you referring to? The Smith case from 2020, I believe you were on the panel, Your Honor. Okay. So in that case, the court held that there's not a protected liberty interest under the federal Constitution. So the only thing that Mr. Cartagena could point to is a Virginia practice, procedure, or policy. Of which I just pointed you to. Mr. Cartagena... And you said he relied on it because it was an exhibit to the complaint. Two responses to that, Your Honor. First of all, in Mr. Cartagena's complaint, he points to policy, which is actually 841.4, which is what allows for mandated review of restricted... So he pointed to the incorrect part of the policy, but in your brief, you pointed to the correct part of the policy that says there is supposed to be a hearing and an opportunity to be heard, right? Correct, Your Honor. So just to be clear on this point, Mr. Cartagena, in his complaint, alleges that the liberty interest arises from the mandated review every 28 days. That's what this court has pointed to in Nkuma, in Thorpe, cases like that. So while Mr. Cartagena is pro se, this court does not have any obligation, in fact, should not rewrite his complaint for him. So he did plead the wrong policy, but that is something he should be held to. Putting that aside, and going to your question, Your Honor, about the separate policy about the procedures, that would only be one step in the analysis. There needs to be a protected liberty interest. What was the reason you said that 28 days didn't apply? So the policy in the briefing on page 28 of Mr. Cartagena's brief, the counsel uses sort of strategically placed brackets to say that the liberty interest arises in being held out of segregation units, is what is in the brackets, for a mandated review for 28 days. However, that's not what that policy says. It says RHU units. And the policies make clear, subject to judicial notice, they're cited in our brief. Those policies make clear that RHU units and SDTP, which is the program that Mr. Cartagena alleges he was in, are two completely separate things. RHU units is maximum security for, it does not have a mental health treatment component. So does the Virginia procedure that Judge Thacker's been referring to, does that differentiate the SDTP program from the RHU for this purpose? That's correct. So the policy that Judge Thacker is mentioning is the specific procedures for putting someone in the SDTP as opposed to the RHU units. In fact, and we have this in our briefing, but the policies make clear that the RHU units, when a person with a serious mental illness is only allowed to be in there for 28 days, they can be moved into SDTP if the 28-day window relevant. In his complaint, he was referencing the RDU, whatever provision, and not the SDTP provision. That's correct. That's correct. The policy that Mr. Cartagena pointed out in his complaint and then on appeal is that the liberty interest arises from a mandated review every 28 days. And where is it we can look at the policies that were in effect at the relevant time period? Where can we find those? Because the link in both briefs, when we click on it, goes to a 2023 version that's different from what either parties are saying. Your Honor, they must have updated the policies online. They did. We'd be happy to provide them to the court if that would be helpful, the older policies. The one that was in the 2020 policy. Sure. And for specifically the set of procedures that are at issue here is what you're asking, Your Honor. We'd be happy to provide those. I do believe that, and counsel can correct me if I'm wrong, I do believe that neither party disagrees with the language of the policies that were at issue. I apologize that it hasn't apparently changed online, but we can provide the court with those. Yeah, we just want to be able to be looking at the correct and relevant policies. So putting everything else aside, did he get a hearing and an opportunity to be heard before he was placed in this unit? In the record, he alleges that he did not. I will say that if this case does go back for summary judgment, that the record will absolutely show that he did, in fact, get a hearing. Or, sorry, he was offered a hearing, but he waived the right to a hearing. So, again, I don't know if that's him just pleading around that issue, but the allegations and the complaint are that he did not get a hearing. That is correct. However, that is only one step of the analysis, the liberty interest. Right, you keep wanting to get to your other steps. That's correct. We would say that, again, I do think he fails on the liberty interest because he pointed to the mandate or review for RHU units. You're going pretty quickly, but I gather that's raising the questions is your argument is that he's not entitled to a hearing unless there is a deprivation of a liberty interest. That's right. Okay, so that's what you ought to be saying. And because he doesn't allege a deprivation or at least an applicable deprivation of a liberty interest, he's not entitled to a hearing. That's correct. And to the extent that we would look at that separate policy and somehow a liberty interest would be created from that separate policy about the SDTP procedures, we would still go to the second factor of the analysis, which is the harsh and atypical conditions of SDTP. And there we have sort of three relevant factors that this court has looked at based off of the Supreme Court's decision in Wilkinson. There's the magnitude of the conditions, there's the indefiniteness of the conditions, and there's the collateral consequences. And the magnitude of the conditions here, we have several cases that find those sufficiently harsh, those sorts of conditions, right? Two responses to that, Your Honor. You have two responses to everything. Sometimes I have three. You never get to get to the second one. I know. My first response is that in the actual exhibits that are attached to the complaint, it makes clear those conditions are not, in fact, like the ones that this court has found to be of a certain magnitude in other cases. But if we were to ignore them... Yeah, which exhibits in particular? So in the responses that the prison officials are making to Mr. Cartagena's grievances, I point this court to JA46, JA29. The prison officials are explaining to him just what you were talking about, Judge Niemeyer, earlier in my friend on the other side's argument, that there are certain phases, there's SCORE and there's EPIC, where the individual in STTP is working through the conditions of treatment. They're getting more and more programming, religious services, things of that nature. So those allegations, those exhibits, make clear that the allegations in Mr. Cartagena's complaint are not telling the full story. You said JA49? 46, Your Honor. I'm sorry. What was the second one? 46 what? 4629. 4629. Yes, Your Honor. And even if we put aside the exhibits that show the sort of differentiation between the SCORE and the EPIC phases, and then I would agree, Your Honor, that the allegations that Mr. Cartagena makes are similar to allegations in other cases like Smith and Thorpe and things of that nature, although they are certainly different. He only alleges 21 hours of confinement, whereas some of those cases are 23 or 24. I don't want to nitpick here. So to the extent that those allegations are the full story put inside the exhibits, there would still be the questions of indefiniteness and then the collateral consequences. Indefiniteness, this court in Smith, and again, Judge Thacker, you were on that panel, mentioned that in that case the prisoner had been held in those conditions for four years and then contrasted that to courts around the country that have looked at two and a half years being not indefinite enough. And here it was 18 months. It was 18 months. So it was less than the two and a half years that courts around the country have looked to as not indefinite enough for that factor. And then the third factor is collateral consequences. Here Mr. Cartagena alleged generally that one could lose certain things, such as good time credit. He does not, in fact, allege that he himself had any collateral consequences to his sentence, which is relevant here because this is not a class action. This is not a group of prisoners bringing this claim. This is about Mr. Cartagena himself and whether he, in fact, had any collateral consequences. So again, the sort of analysis would go, is there a liberty interest? And I agree with you, Judge Niemeyer, there is not one. But even if there were, it would need to be harsh and atypical conditions in the prison. And for those reasons that I just mentioned, that would not be the case. Even if we got through both of those gates, there would still need to be a violation of the minimum procedures that were due. Here Mr. Cartagena alleges very clearly that he, and the exhibits obviously make this clear, that he was able to make certain grievances. I think there are about 15 that are in the record. And that he was getting responses to all those grievances. This court made clear in Thorpe that the elementary- But those were all after he was already placed in the unit, right? Six to nine months after. That's correct, Your Honor. I will say that my friend on the other side makes a lot of that six to nine months. It's not like the prison officials were not responding to his grievances. He was making grievances starting in May, which was about six months into his time in STTP. And they were being responded to within a week or so. So he was getting responses in real time. But this court made clear in Thorpe that the elementary protections of due process require information at some point and an opportunity to respond to that. There's no requirement. In fact, Thorpe made clear there's no requirement for a pre-deprivation hearing that would be required under the federal constitution. Except in the Virginia policy itself. It provides for a hearing before being placed. I thought you agreed with that. I do agree with that specific point. But the relevance that has to the federal 14th Amendment due process claim is a separate analysis. And so there's both a question of... Just to be clear before you go on from there. We were talking about he used the wrong Virginia procedure in his complaint because he referred to this residual housing program instead of the STTP. And that provision for the residual housing had a notice and hearing component to it. Does the STTP procedure also have that? I want to make clear about what you're saying, Your Honor. The STTP, which is what Judge Thacker has been asking about, those procedures, I think that is 830.5, those procedures do require the hearing and notice. 841.4, which is about the RHUs, that's the 28-day mandated review, which Mr. Cartagena made so much of in his complaint and in his briefing. But it's about a completely different security confinement. The policies that we're talking about that would be relevant to STTP do have a notice and hearing. However, that would only be part of the analysis. The question then would be, what does the federal Constitution require? The federal Constitution does not require a hearing and notice of pre-deprivation.  And the complaint itself, the exhibits that are attached to it, make very clear that Mr. Cartagena got a lot of information once he made grievances, and then because he was making grievances, had plenty of opportunities to respond. Unless there are any further questions about due process, I'd like to briefly turn to the Eighth Amendment claim. So there needs to be both an objective risk of harm and then subjective knowledge. Counsel, my friend on the other side, focused on the objective risk, so I'll focus my attention there as well. The exhibits that are- The trial court assumed that the objective prong was satisfied. That's correct. The trial court did assume that. This court, of course, can affirm on any grounds supported by the record. And the court, while assuming that factor, also did mention the fact that the exhibits that are attached to the grievances and the responses to the grievances and the policies themselves made clear that the conditions were exactly meant for mental health patients, such as Mr. Cartagena. There is a treatment program within the prison. There are escalating social programming and religious services. The conditions are just not at all similar to the ones that were in Porter and Thorpe, which is what counsel points to. Even if we were to put aside the exhibits that are attached to the complaint, we still have, and this is to, I believe, your question, Judge Agee, there are cases that this court has pointed out about Eighth Amendment claims. Porter is certainly one of them. But on the other side of the ledger, sort of goalposts, if you will, is Nicol. This court, in the 1990s, held that there were certain people who were put into solitary confinement conditions, held that the solitary confinement itself is not what creates an Eighth Amendment problem. And this court in Porter pointed out that the difference between Porter, which was death row, and Nicol is that Porter, that people were put there based off of their sentence and there was no way for them to get out. Whereas in Nicol, they were put there because of their in-prison conduct and they had a way out. In that case, it was renouncing gang membership. So this case is much more similar to Nicol, where Mr. Cartagena was put in for his in-prison conduct, here assaulted behaviors and having a serious mental illness, and then he had a way out, which is going through the treatment program. So he can sort of work his way out of the restrictions. That's exactly right, Your Honor. Unlike in Porter, where the inmates were there, it was death row, there was no way out for them. They were there based from the day that they were sentenced, they were sent to death row, and they weren't going to get out. So it's just a completely different set of facts. And then I'd like to turn to the ADA claim very briefly. There are three relevant factors to an ADA claim. Whether the individual is disabled, we certainly don't deny that Mr. Cartagena has a qualifying disability, but he still would need to show that he was otherwise qualified for general population and that he was denied benefits on the basis of his disability. The general population question is significant because Mr. Cartagena admits that based off of this court's holding in Falconeer, I'm sorry for mispronouncing that name, but it needs to be only on the basis of disability that the person was not qualified for general population. Well, he alleges in his complaint that he was put in this unit based on his serious mental illness. Why isn't that sufficient at this stage? So his complaint and the grievances are a little bit contradictory on this. He also says that it's a program that's a behavior modification program for recalcitrant offenders. And those are the grievances that you pointed us to earlier that were attached to the complaint? That's correct, Your Honor. In those, he's saying I shouldn't be an SMI, or I shouldn't be an SDTP. That's for recalcitrant offenders that need behavioral modification. That's not me. The policies that are attached are Southern Judicial Notice and then also the responses to those grievances make clear that someone goes to SDTP for two reasons. They have a serious mental illness, and they frequently engage in assaultive, disruptive, or unmanageable behaviors. So it is not solely on the basis of his disability that Mr. Cartagena was put into SDTP. And then even if it were, he would need to show that he was denied benefits on the basis of his disability. SDTP is the benefit. He would otherwise have gone into restrictive housing units, the RHUs that we were talking about earlier, Judge Agee. That maximum security situation would be the appropriate setting for someone who had engaged in such assaultive, unmanageable, or disruptive behaviors. But because of his mental illness, he actually was given the benefit of going to SDTP as opposed to RHUs in order for him to get treatment. Unless there are any further questions, we'd respectfully ask for the district court to be affirmed. All right. Thank you, Mr. Parkey. Mrs. Whitakin. Thank you, Your Honor. I'd like to start by clarifying a factual matter. In his complaint, Mr. Cartagena did identify the relevant policy that governs the SDTP. That's Operating Procedure 830.5. He referenced that policy on Joint Appendix page 81. And that is the policy that gives rise to his liberty interest here. It does mandate notice and a hearing, and he was not given the required notice. Another question. I think if I hear the State's argument on that, he is entitled to that hearing, and it's not in the record. Of course, he argues that on summary judgment, they would put in evidence that he waived that. But more material is the fact that you only have to have a hearing in connection with the denial of a liberty interest. And they say that there is no liberty interest attached to the SDTP, as distinct from the RHU, which creates a 28-day window. Well, yes. The liberty interest arises in part from the decision-making process that leads to someone being placed in the SDTP to begin with. That policy provides the expectation of avoiding the conditions of confinement, and that is what gives rise to a liberty interest. Once that policy has been identified, which Mr. Cartagena did do in his complaint, then the court turns to whether the conditions are sufficiently harsh and atypical. What about all of the exhibits attached to the complaint that opposing counsel argues belie a lot of the allegations in the complaint? What are we to do with that? About the conditions, Your Honor, or about the fact that many of the allegations are, according to opposing counsel, are contradicted by the exhibits attached to the complaint itself. So that while we're supposed to take the allegations as true at this stage, the attachments to the complaint make it seem otherwise. Well, Your Honor,  any of Mr. Cartagena's allegations. None of those attachments undermine or contradict his allegations about the conditions that he was confined in. None of them provide any information indicating that he did receive notice or an opportunity to respond. None of them provide any information that he was given any accommodations. And the grievances in particular were discussed as something that perhaps could have given him the process he was due, but they simply were not sufficient to provide the meaningful notice of the factual basis for his confinement. The first responses that provided any information specific to his placement in the SDTP came nine to ten months after he was first placed there, and they provided only vague, perfunctory information. They said he was there because of a, quote, inability to function, and a second one said he was in the SDTP because, quote, you meet the criteria and are a seriously mentally ill offender. One of his grievances that this unit is designed for recalcitrant offenders. So that's opposite of I'm here because of my serious mental illness. Well, I think two things can be true at the same time. I don't think there's any dispute that the unit is designed for and only houses people with serious mental illness. And he also is of the understanding that people are sent there because of some sort of recalcitrance, which again is not in conflict with the policies. But again, at this stage, a lot of these questions about how the unit operates, what the policies say, those are factual questions to be developed through discovery and presented to a fact finder. Here we have to look at the allegations as contained in Mr. Cartagena's complaint and take those allegations. What's the relief you want? Your Honor, we're asking this course to reverse the district court's dismissal and remand for further proceedings on the merits. What relief does he want? What relief does he want? Mr. Cartagena has asked both for damages and injunctive relief that could come in the form of removal from the SDTP, if that's where he's at, or the provision. He admitted he wasn't there when he wrote this. He said he was in MD, some other facility.  When he wrote the complaint, he had been removed from the unit and was asking not to be returned to that unit because of the substantial risk of serious harm the unit created. And a district court could order that type of injunctive relief after finding a constitutional violation. And I see I'm over my time, so again... Thank you very much. We'll come down in Greek Council and proceed on to the last case.
judges: Paul V. Niemeyer, G. Steven Agee, Stephanie D. Thacker